SOO LINE RAILROAD COMPANY,
Plaintiff,

v.

SYSTEM FEDERATION NO. 7, RAIL-
WAY EMPLOYEES' DEPARTMENT A.
F. OF L.–C. I. O. (CARMEN), Defend-
ant.

No. 80 C 3000.

United States District Court,
N. D. Illinois, E. D.

Sept. 7, 1982.

Marvin F. Metge, Gorham, Metge, Bow-
man & Hourigan, Chicago, Ill., for plaintiff.

Marvin Gittler, Asher, Goodstein, Paval-
on, Gittler, Greenfield & Segall, Ltd., Chica-
go, Ill., for defendant.

Memorandum

LEIGHTON, District Judge.

This is a suit to review Award No. 8289
of the National Railroad Adjustment Board,
Second Division (NRAB), issued pursuant to
the Railway Labor Act, 45 U.S.C. § 151, *et
seq.* Plaintiff is the Soo Line Railroad
Company (Soo Line); defendant System
Federation No. 7, Railway Employees' De-
partment, AFL–CIO (Carmen), has filed a
counterclaim for enforcement of the award
pursuant to Section 153 of the Act. This
court has jurisdiction pursuant to 45 U.S.C.
§ 153 First (q), in that this is a petition to
review an award and order of the Board.
The matter is now before the court on
cross-motions for summary judgment; and
the material facts, to which there is no
genuine issue, are as follows.

I

Soo Line is a State of Minnesota corpora-
tion; it is a carrier as defined by the Act,
and it operates in the state of Illinois within
the district of this court. Carmen is an
unincorporated association, and it acts as
the collective bargaining representative of
railroad carmen employees who entered
into the Controlling Shops Craft Agreement
(Agreement) with Soo Line, effective Janu-
ary 1, 1954. The Railway Labor Act gov-
erns labor relations between rail carriers or

their representatives and carrier employees or their representatives. Soo Line is such a carrier governed by the Act, and the Carmen is a representative of Soo Line's employees within the meaning of the Act. At all material times there have been in effect collective bargaining agreements between Soo Line and Carmen regarding length of work weeks, overtime, rest days and holidays.

In April 1977, a dispute arose between Soo Line and Carmen regarding the interpretation and application of rules contained within the agreements because Soo Line instituted new work schedules which included Saturdays and Sundays, thus establishing seven day work weeks at four of its shop facilities in Wisconsin and Minnesota where carmen are employed. Carmen claimed that Soo Line had violated the collective bargaining agreement between them when it established the seven day work weeks, while Soo Line argued that it had established an operational necessity for seven day work weeks because of an order backlog; and that the change to seven day work weeks because of operational necessity was consistent with the language and intent of the agreement.

The dispute was submitted by Carmen in November 1978 to NRAB for resolution; and on March 26, 1980, NRAB issued Award No. 8289, the subject of this litigation. It decided that Soo Line violated the collective bargaining agreement by establishing seven day work weeks in shop facilities where none had existed previously, and ordered Soo Line to pay its employees for Sundays at overtime in addition to their regular forty hour per week salaries. To date, Soo Line has not paid those employees. Because four terminals are involved, the amount Soo Line owes is potentially many hundreds of thousands of dollars. Soo Line now requests this court to vacate that order; Carmen asks that it be enforced.

■ The standards for reviewing awards made by the NRAB are "among the narrowest known to the law." *Denver & Rio Grande Western R. Co. v. Blackett,* 538 F.2d 291, 293 (10th Cir. 1976). The parties agree

that a NRAB award may only be disturbed if one of three grounds is found to exist: (1) failure of NRAB to comply with the Act; (2) the award failed to conform or confine itself to matters within NRAB's jurisdiction; or, (3) fraud or corruption on the part of NRAB members. 45 U.S.C. § 153 First (p). If none of these grounds exist, an award issued by NRAB is final and binding, and the NRAB's findings and order are conclusive. *Union Pac. R. Co. v. Sheehan,* 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978); *Kotakis v. Elgin, Joliet & Eastern Railway Co.,* 520 F.2d 570, 575 (7th Cir. 1975). Indeed, it has been held that an NRAB award cannot be disturbed unless it is found to be "actually and undisputedly without foundation in reason or fact," *Laday v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 422 F.2d 1168, 1171 (7th Cir. 1970), or "wholly baseless and without reason." *Gunther v. San Diego & Arizona Eastern Railway Co.,* 382 U.S. 257, 261, 86 S.Ct. 368, 371, 15 L.Ed.2d 308 (1965). Soo Line claims that NRAB exceeded its jurisdiction by issuing Award No. 8289 which, according to it, altered rather than interpreted the collective bargaining agreement. A review of the history leading to adoption of this collective bargaining agreement is helpful in understanding Soo Line's rather complicated theory.

In 1948, carriers became involved in a bitter dispute with shop craft organizations which sought to change their members' work weeks from six to five days, with no concomitant reduction of pay. Carriers counter-proposed elimination of automatic time and a half pay for work on Sundays. Because arbitration, bargaining and mediation procedures under the Act failed to resolve the dispute, a Presidential Emergency Board was created. According to Soo Line, the Emergency Board's recommendations constituted the foundation for the collective bargaining agreement which is now the subject of this litigation, because collective bargaining efforts made after recommendations issued resulted in adoption of that agreement.

Specifically, the Emergency Board recommended that carriers be entitled to institute staggered work weeks without premium pay for work on Saturdays or Sundays, because of the railroad industry's obligation to provide services on a continuous, seven day week basis. It based its recommendation in part on its finding that in non-continuous industries, where employees were needed to perform continuous services, such as powerhouse and plant protection, work weeks were commonly staggered, and employees were not always paid premium rates for Saturdays and Sundays.

Nevertheless, shop craft organizations continued to demand that work weeks should be reduced to 40 hours from 48 without a reduction in pay, and that employees should receive premium pay for Saturdays and Sundays (and, of course, for hours in excess of 40 per week), whether or not those days were included in a five day work week. The Emergency Board's opinions and recommendations were memorialized in a letter dated February 27, 1949, written by members of the Emergency Board to the Carriers Conference Committees and sixteen cooperating railway labor organizations. (Exhibit D, Soo Line's Appendix):

The next question relates to the staggering of the workweek and Saturdays and Sundays as the days of rest. Obviously, if the workweek is staggered some employees cannot have these specific days off. That the Board expected deviations from this pattern is made abundantly clear by its repeated use of the expressions "staggered workweek", "in accordance with the operational requirements," and "so far as practical." The great variety of conditions met in the railroad system of the country and even varied conditions on a single railroad require flexibility on this matter. The tenor and substance of the Board's discussions and recommendations show definitely that the Board intended to permit the Carriers to stagger workweeks. In contrast to the obligation of the Carriers to sustain the burden of proof in the matter of non-consecutive rest days, it is for the employees here to show that some particular operational requirements of the Carrier are not better met by having the workweeks staggered.

Clarification had been requested with respect to punitive pay for Saturdays and Sundays, and in response, the letter stated:

The Board expressly denied the Organizations' requests for a uniform workweek of Monday through Friday, and for punitive pay for Saturdays and Sundays as such. It had in mind the continuous nature of some of the operations on railroads. Work which at one time had been performed 7 days per week has been cut down to 6 days, and avoidable Sunday work has largely been eliminated by force of the penalty pay provisions included in the agreements. Certainly the Board did not contemplate the reinstatement of work on Sundays where it has been found it can be dispensed with. This would be a distortion of its reason for recommending the elimination of penalty pay on Sundays as such. On the other hand, it did not expect a rigid adherence to the precise pattern that may be in effect immediately before September 1, 1949, with regard to the amount of Sunday work that may be necessary. Changes in amount or nature of traffic or business and seasonable fluctuations must be taken into account. This is not to be taken to mean, however, that types of work which have not been needed on Sundays will hereafter be assigned on Sundays. The intent is to recognize that the number of people on necessary Sunday work may change.

Against this historical backdrop, Soo Line argues that once it establishes operational necessity, it may institute seven day work weeks without penalty pay for Saturdays or Sundays. Soo Line further argues that Award No. 8289 exceeded the NRAB's jurisdiction in that the award changed, rather than interpreted, the terms of the collective bargaining agreement. A contemplated change in a collective bargaining agreement is deemed a major dispute over which the NRAB has no jurisdiction; in contrast, a minor dispute is one which involves inter-

pretation or application of a pre-existing agreement. Soo Line's theory is that Award No. 8289 in effect, disposed of a major dispute as opposed to a minor one. In *Elgin, Joliet & Eastern R. Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945), the court distinguished between the two:

> The first (Major Dispute) relates to disputes over the formation of collective bargaining agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy.

However, a careful review of the pertinent language of the collective bargaining agreement itself, which Soo Line astutely avoids, as well as the NRAB's authority as set forth in the Act, establishes, in the opinion of this court, that Soo Line's argument is at best, disingenuous. The relevant language of the collective bargaining agreement, is as follows:

### RULE 1-A

a) *General*

> The carriers will establish, effective September 1, 1949, for all employees, subject to the exceptions contained in this agreement, a work week for forty (40) hours each, with two (2) consecutive days off in each seven; the work week may be staggered in accordance with the carriers' operational requirements; so far as practicable the days off shall be Saturday and Sunday. The foregoing work week rule is subject to the provisions of this agreement which follows;

b) *Five-day Positions*

> On positions the duties of which can reasonably be met in five days, the days off will be Saturday and Sunday.

c) *Six-day positions*

> Where the nature of the work is such that employees will be needed six days each week, the rest days will be either Saturday and Sunday or Sunday and Monday.

d) *Seven-day Positions*

> On positions which have been filled seven (7) days per week any two consecutive days may be the rest days with the presumption in favor of Saturday and Sunday.

f) *Deviation from Monday-Friday Week*

> If in positions or work extending over a period of five (5) days per week, an operational problem arises which the carrier contends cannot be met under the provisions of this agreement, Rule 1-A, Paragraph (b), and requires that some of such employees work Saturday instead of Monday to Friday, and the employees contend the contrary, and if the parties fail to agree thereon, then if the carrier nevertheless puts such assignments into effect, the dispute may be processed as a grievance or claim under current agreement effective January 1, 1954.

g) *Nonconsecutive Rest Days*

> The typical work week is to be one with two (2) consecutive days off, and it is the carriers' obligation to grant this. Therefore, when an operating problem is met which may affect the consecutiveness of the rest days and positions or assignments covered by paragraphs (c), (d) and (e), the procedure shall be used:

> \*    \*    \*    \*    \*    \*

> (2) Possible use of rest days other than Saturday and Sunday, by agreement or in accordance with other provisions of this agreement.

*Overtime, Rest Days and Holiday Work:*

### *Rule 6*

1. Service performed on an employees' [sic] rest days and ... [legal holidays] ... shall be paid for at the rate of time and one-half.

2. Existing provisions that punitave [sic] rates will be paid for Sunday as such are eliminated. The elimination of such provisions does not contemplate the reinstatement of work on Sunday which can be dispensed with. On the other hand, a

rigid adherence to the precise pattern that may be in effect immediately prior to September 1, 1949, with regard to the amount of Sunday work that may be necessary, is not required. Changes in amount or nature of traffic or business and seasonal fluctuations must be taken into account. This is not to be taken to mean, however, that types of work which have not been needed on Sundays will hereafter be assigned on Sunday. The intent is to recognize that the number of people on necessary Sunday work may change.

Award No. 8289, as issued by the NRAB, provides in pertinent part:

> We ... find that the Carrier [Soo] sufficiently demonstrated that there were operational needs for changing work week assignments. The build up of bad order cars heightened by the institution of more demanding regulations established by the Federal Railroad Administration created a bona fide operational need.
>
> Thus, the Carrier's changing work week assignments from Monday through Friday to Tuesday through Saturday was consistent with the language and the intent of the applicable agreements.
>
> However, the Organization (Carmen) has convincingly argued that deviation from Monday to Friday work week assignments to Tuesday to Saturday schedules is the only change permitted and is specifically referenced in sub-paragraph (f) of Rule 1–a, cited above. Further, the Organization states that seven (7) day positions under sub-paragraph (d) of Rule 1–A can only be established where such positions *have been* filled previously in this manner. The record before us does not indicate that any of the positions at the shop facilities on the repair tracks have previously been filled on a seven (7) day position basis. Therefore, we conclude that although the Carrier had the right to change work week assignments, this right was limited by the specific language of the agreements referred to above. Establishing work weeks with Sunday as one of the five (5) days contemplated in an employee's standard

work week assignment violated the terms of the agreement. The remedy for this violation is dictated by the terms of Rule 7 which would require that where Sunday is one of the rest days, existing rules providing for compensation on Sunday shall apply.

■ In order to prevail, as indicated above, Soo Line must establish that the NRAB exceeded its jurisdiction or failed to comply with the Act by issuing Award No. 8289. 45 U.S.C. § 153 First (p). The foundation for Soo Line's complaint rests on its interpretation of the history surrounding adoption of the collective bargaining agreement and the extent to which that background should affect the NRAB's interpretation of the agreement. In effect, Soo Line's position is that the NRAB misinterpreted the agreement to such an extreme that it rewrote the agreement by supplying terms never agreed to; and that the NRAB's jurisdiction does not include authority to impose new terms, nor is the power to do so within the scope of the Act.

The argument that misinterpretation constitutes a rewriting of a collective bargaining agreement is not novel. Unfortunately, the weight of authority is such that this court must reject it. In *H. G. Skidmore v. Consolidated Rail Corp.*, 619 F.2d 157, 159 (2nd Cir. 1979), the court addressed the theory in the following fashion:

> First, we are not persuaded that the NRAB did misinterpret the labor agreement.... Second, if we were so persuaded, we could still only grant relief on the specious theory that the NRAB is without jurisdiction to make mistakes, with its corollary that in spite of the limiting language of § 153 First (q) a party is entitled to a virtually de novo review whenever he asserts error by the NRAB.... Like any other adjudicatory body, the NRAB is not perfect, and will make mistakes from time to time. Under appellant's expansive notion of what to count as a jurisdictional defect in an NRAB action, the district court would have ongoing authority to remedy all of

these errors. But our power is circumscribed sharply by the clear congressional plan under which NRAB decisions may not easily be set aside by the courts. Thus even if we thought the NRAB had erred in this case (which we do not), we could not overturn its decision.

A similar argument was considered and rejected in *United Transportation Union v. Soo Line Railroad Co.*, 457 F.2d 285 (7th Cir. 1972).

Even if this court disagrees with the NRAB's interpretation of the collective bargaining agreement, it is powerless to substitute its opinion for that of the Board under the pretext that it exceeded the scope of its jurisdiction or failed to comply with the Act. *Brotherhood of Ry. v. Kansas City Terminal Ry. Co.*, 442 F.Supp. 1173 (W.D. Mo.1977).

The last question is whether this court can overturn Award No. 8289 insofar as it awards time and one-half for the Sundays worked, in addition to the basic straight time already paid to Carmen who have been forced to work on Sundays.

This portion of the Award is, of course, subject to the same standard of review applied above. Rule 7 provides that work in excess of forty (40) straight time hours any work week shall be paid for at one and one-half times the basic straight time rate. In light of the analysis set forth above, NRAB's interpretation of the collective bargaining agreement is conclusive as to the remedy fashioned by it, and this court affirms it in all respects. For these reasons, Soo Line's motion for summary judgment is denied; Carmen's cross-motion for summary judgment is granted, and judgment is entered for Carmen.