P.A. MILLER, et al., Plaintiffs,

v.

CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Defendant.

No. 86 C 4181.

United States District Court, N.D. Illinois, E.D.

Nov. 17, 1986.

---

Marvin Gittler, Chicago, Thomas A. Woodley, Washington, D.C., for plaintiffs.

George H. Brant, John T. Van Gessel, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

P.A. Miller ("Miller") and Brotherhood Railway Carmen of the United States and Canada, AFL–CIO, CLC ("Union") sue under the Railway Labor Act (the "Act") (specifically 45 U.S.C. § 153 First (q) [1]), seeking review of Award No. 10746 (the "Award") rendered by the National Railroad Adjustment Board ("Board") [2] Second Division in a dispute between plaintiffs and Chicago and North Western Transportation Company ("North Western"). Now North Western has moved for dismissal under Fed.R. Civ.P. ("Rule") 12(b), and plaintiffs have moved for summary judgment under Rule 56. [3] For the reasons stated in this memorandum opinion and order, plaintiffs' motion is granted and North Western's motion is denied.

---

1. All sections of the Act will hereafter be cited "Act § —," referring to the Title 45 numbering rather than the Act's internal numbering (which would omit the first two digits of the Title 45 citation).

2. Board is a permanent arbitral tribunal created by Act § 153 First. Board's Second Division has jurisdiction over disputes involving carmen (Act § 153 First (h)). For simplicity this opinion will simply use "Board" in referring to that Division as well.

3. Because North Western (like plaintiffs) has tendered supporting exhibits for this Court's review, its dismissal motion will also be converted to Rule 56 treatment in accordance with the last sentence of Rule 12(b). Though North Western R.Mem. 1 n. 1 speaks of plaintiffs' summary judgment motion as "premature," that ignores the specific language of Rule 56(a) allowing such a motion at this time; and the same footnote's characterization of the motion as "unnecessary" is really a matter for plaintiffs (or this Court) to decide.

### Facts [4]

In April 1980 North Western took over operation of portions of the bankrupt Chicago, Rock Island and Pacific Railroad Company (the "Rock Island") under the provisions of an agreement known as the Miami Accord. Miller, who had worked as a carman with the Rock Island, became employed by North Western as a sheet metal worker. Although Miller requested transfer on several occasions to a carman's position in North Western's Car Department, transfer was denied because his brother worked there and North Western's Policy No. 17 precludes relatives from working within the same department.

On July 23, 1982 Miller was furloughed from his position as a sheet metal worker due to a reduction in force. When Miller's brother left North Western on medical disability some time after that, Miller again requested transfer to the Car Department. North Western, unaware Miller had still another relative (K.E. Reed) working as a carman, responded transfer would be permitted provided it was within the scope of the existing agreement between North Western and Union (the "Joint Agreement"). Miller then formally requested and completed his permanent transfer to the Car Department October 4, 1982.

Miller's seniority as a carman began that day in accordance with General Rule 18 of the Joint Agreement:

Employes [sic] transferred from one point to another, with a view of accepting a permanent transfer, will, after thirty days, lose their seniority at the point they left, and their seniority at the point to which transferred will begin on date of transfer, seniority to govern. Employes will not be compelled to accept a permanent transfer to another point.

Just 18 days after his permanent transfer to the Car Department (October 22, 1982)

Miller received this notice from North Western:

Because of your family relationship with carman K.E. Reed, a violation of Chicago and North Western Transportation Company Policy No. Seventeen (17) has occurred, therefore, your application for employment as carman has been rejected.

Effective close of shift October 22, 1982, you are hereby relieved of your assignment as carman. You will retain no rights or privileges associated with your tenure as carman.

Your employment status will revert to that of sheetmetal worker on furlough.

Because no formal investigation into the matter was ever conducted, Miller then challenged North Western's action as a dismissal in violation of a May 1, 1977 Union-North Western Memorandum of Agreement (the "Memorandum"). In part the Memorandum, which governs application of Joint Agreement Rule 35 (Discipline and Investigation) to carmen, provides:

(a) Except as provided in section (f) hereof, an employe [sic throughout] in service more than sixty (60) days will not be disciplined or dismissed without a fair and impartial investigation. Such investigation shall be scheduled promptly and held not later than thirty (30) days from the date of occurrence, or not later than thirty (30) days from the date information concerning the alleged offense has reached his supervising officer.

\* \* \* \* \* \*

(h) If it is found that an employe has been unjustly disciplined or dismissed, such discipline shall be set aside and removed from his record. He shall be reinstated with his seniority rights unimpaired, and be compensated for wage loss, if any, suffered by him, resulting from such discipline or suspension, less

4. On cross-motions for summary judgment, each party opposing the other's motion is entitled to all reasonable favorable factual inferences (*Shango v. Jurich,* 608 F.Supp. 931, 933 n. 2 (N.D.Ill.1985)). That dual perspective sometimes creates the potential for denial of both motions, but no such risk exists here because of the total absence of factual controversy or of disputed inferences from the undisputed facts. *Bowyer v. United States Department of Air Force,* 804 F.2d 428, 430–31 (7th Cir.1986).

any amount earned during the period such disciplinary action was in effect.

\* \* \* \* \* \*

(k) If investigation is not held or decision rendered within the time limits specified herein, as such time limits are extended by agreement or postponement, the charges against the employe shall be considered as having been dismissed.

After Union had exhausted grievance procedures on behalf of Miller and failed to reach agreement with North Western, the dispute was transferred to Board for resolution.

### Board's Decision

Miller and North Western urged conflicting interpretations of Memorandum § (a) before Board:

1. North Western argued "an employe in service more than sixty (60) days" means an employee in service *in his craft* for that period. It therefore asserted Miller, upon transfer to the Car Department, became a probationary employee not "in service more than sixty (60) days," so no investigation was required.

2. Union contended "an employe in service more than sixty (60) days" means an employee in service *with North Western* (and not within a particular craft) for that period. Miller, employed by North Western since 1980 as a sheet metal worker, satisfied that requirement even though he had not been in the Car Department for longer than 60 days.

Those opposing positions created a deadlock within the ten-member Board (five selected by the railroad industry and five by the railroad unions under Act § 153 First (h)). As provided in Act § 153 First (*l*), Referee Jonathan Klein was selected to sit with Board as a neutral member to make an award. Board then issued the "Award" along with two separate opinions: a dissenting opinion by the five industry members and a concurring and dissenting opinion by the five labor members.

As it turned out, the Award was a partial but not total victory for Miller, which is why he and Union have petitioned for review here. Board did reject North Western's reading of Memorandum § (a), finding (Award at 3–4, emphasis in original):

In argument to the Board, the parties were in agreement that [Miller's] transfer into a new craft did not result in a carry-over of his 1980 seniority date for purposes of seniority status as a Carmen [sic]. Therefore, the Board finds based upon the parties' position and Rule 28's mandate of common seniority between employees at each point in their respective craft, that when [Miller] was permitted by [North Western] to transfer to the Car Department within [North Western's] Des Moines shop on October 4, 1982, his Carmen's seniority began on that date. Nevertheless, [Miller] retained his initial date of hire under the Miami Accord for purposes of determining his contractual right as an employee to an investigation pursuant to Rule 35.

The Board is of the considered opinion that [Miller] was an employee in [North Western's] service for more than sixty days at the date of his transfer to the Car Department. The Board finds that the words "in-service" cannot reasonably be construed to preclude the application of Rule 35 to the removal from service of an employee in a separate craft....

There is no contractual language or other evidence of record to suggest that the parties intended "seniority" to be the functional or definitional equivalent to "in-service." As this case demonstrates, an employee's particular craft seniority may be of virtually no protection or value *after* an authorized cross-craft transfer....

This act of transfer, however, absent contractual language to the contrary, cannot diminish the length of an employee's employment relationship with [North Western], nor the corresponding period of "in service." [5]

5. [Footnote by this Court] Board refers to the Memorandum as "Rule 35" (see, e.g., Award at

Yet instead of ordering North Western to dismiss the charges against Miller as Memorandum § (k) called for, Board remanded the case (Award at 4):

> to [North Western's] property for a fair and impartial investigation to resolve the issue of whether [Miller's] transfer to the Car Department was a violation of Policy No. 17.

Not surprisingly, Board's labor members concurred in the finding Miller had been entitled to an investigation but argued Board exceeded the scope of its authority in ordering a hearing rather than dismissal of the charges.[6] Board's industry members, on the other hand, dissented from Board's reading of Memorandum § (a) and also argued Miller had not been disciplined within the meaning of that provision in any event.

### Contentions of the Parties

It is of course the second portion of the Award—the remedy—that plaintiffs ask this Court to set aside because Board, by failing to order the remedy mandated by Memorandum § (k), assertedly exceeded its jurisdiction in violation of the Act. North Western in turn contends this Court cannot disturb the Award because:

1. Board did not exceed its authority in interpreting the Memorandum to require a hearing.

2. This Court lacks jurisdiction even to review the Award because Board, by remanding to North Western for a hearing, retained jurisdiction over the matter.

This opinion necessarily treats first with North Western's challenge to this Court's jurisdiction.

### Jurisdiction

■ Because Board remanded the case to North Western for an investigation,

North Western Mem. 13–14 says "Board continues its jurisdiction over this case as to whether the North Western holds an investigation and also as to whether it was a fair and impartial investigation." From that premise North Western reasons this Court lacks jurisdiction to review Board's order.

This Court must look to the Act, of course, to determine its power in that respect. Act § 153 First (m) provides an award is "final and binding upon both parties to the dispute" when rendered by Board. To make the Award effective (Act § 153 First (o)), Board ordered North Western to conduct a fair and impartial investigation of whether Miller's transfer to the Car Department violated Policy No. 17. Act § 153 First (q) permits Miller and Union to challenge, and this Court to review, that Board order:

> If any employee ... is aggrieved by the failure of any division of the Adjustment Board to make an award in a dispute referred to it, or is aggrieved by any of the terms of an award or by the failure of the division to include certain terms in such award, then such employee ... may file in any United States district court in which a petition under paragraph (p) could be filed, a petition for review of the division's order.... The court shall have jurisdiction to affirm the order of the division or to set it aside, in whole or in part, or it may remand the proceeding to the division for such further action as it may direct.

In essence, North Western asserts this Court has no jurisdiction to review Board's order until Board determines its order has been satisfactorily executed. But nothing in Act § 153 First (q) imposes that limitation on Miller's and Union's seeking, or this Court's granting, review. On the contrary,

---

3). Because neither party provided this Court a copy of Rule 35 itself, as contrasted with the Memorandum applying that rule, this opinion will refer directly to the Memorandum (rather than to Rule 35 as Board has done).

**6.** They also said Board should have ordered North Western to reinstate Miller with lost

wages, seniority and other benefits in accordance with Memorandum § (h). No specific mention is made of that provision in the Complaint filed with this Court, although plaintiffs do seek that relief in addition to dismissal of the charges.

that section expressly authorizes court review of the order itself (as opposed to whether the order has been complied with) once it is rendered.

Nor does North Western's contention that Board must have retained jurisdiction for purposes of ensuring compliance with its order find support in the Act. After all, were North Western to refuse to comply with the order, Act § 153 First (p) requires Miller to turn to a United States District Court—not to Board—to seek enforcement (see also *Swift v. Chicago & North Western Railway Co.*, 84 F.Supp. 116, 117 (S.D. Iowa 1944)[7]).

Indeed, Board has not purported to retain jurisdiction over the Award (as was the case in *Airline Pilots Association International v. Eastern Air Lines, Inc.*, 632 F.2d 1321 (5th Cir.1980)). North Western Mem. 14 cites that case for the proposition a board may retain jurisdiction over a case while remanding it to a carrier for further action.[8] That, however, is irrelevant to the resolution of the questions now before this Court: Did Board in fact retain jurisdiction over the case for purposes of ensuring compliance with its order, and if so does that preclude court review of the order itself under Act § 153 First (q)?[9]

■ This opinion has already explained why *both* those questions call for negative

answers. But there is an independent ground for rejecting North Western's notion this Court should eschew current review. There are of course two possible results of the investigation Board has ordered:

1. upholding of the charges that caused Miller to be terminated as a carman and restored to furloughed (that is, unemployed) status as a sheet metal worker; or

2. dismissal of those charges.

If the first of those turned out to be the outcome, that would have proved a futile (though time-consuming and distressful) experience, given the assumption (necessary for this stage of the analysis) that Board had acted outside its jurisdiction in the first place—thus compelling a rejection of the later consequence of that Board action. And if dismissal of the charges were the result instead, Miller (and Union) would have been subjected to the identical (and needless) delay, distress and expense to bring about precisely the same result a present decision repudiating Board's action would accomplish.

North Western's position is not sustainable from any perspective. This opinion therefore turns to the review of Board's Award.

---

7. North Western Mem. 14 is wrong in saying the provisions of Act § 153 First (m), under which Board may resolve disputes over the *interpretation* of an award after it has been issued, also mean Board retains jurisdiction over all other aspects of the case as well, thereby precluding court review of the award. That notion flies in the face of the coexisting provisions of Act § 153 First (m) (Board interpretation), Act § 153 First (p) (court enforcement) and Act § 153 First (q) (court review).

8. There Eastern Air Lines ("Eastern") had acquired the assets and pilots of another airline, and one of those new pilots was discharged for failing to satisfy Eastern's proficiency requirements. Board concluded Eastern's training program was inadequate and so ordered the pilot's reinstatement for the purpose of receiving additional training. However, the order also provided:

1. if, after further training, Eastern made a good faith judgment the pilot still failed to meet proficiency standards, the termination would become final and binding; and

2. the arbitration was subject to being reopened on the issue of bad faith performance by Eastern in its training and evaluation process.

One issue before the Court of Appeals was whether Board had exceeded its jurisdiction by delegating its decision on final termination to Eastern. Finding Board had "retained jurisdiction on the ultimate issue of termination by reserving authority over Eastern's performance" (632 F.2d 1325), the court concluded Board had not delegated its responsibility in violation of the Act.

9. *On the second of those questions, it should be* noted the Court of Appeals in *Eastern Air Lines,* though it found Board had retained jurisdiction there (see n. 8), did *not* hold the District Court lacked authority to review Board's order. Instead the decision was that the lower court had erred in its exercise of that authority.

*Review of Board's Order*

■ Act § 153 First (q) permits this Court to "set aside, in whole or in part" Board's order, or remand it for further action, for any of three reasons:

1. Board's failure to comply with the Act's requirements;

2. failure of the order to conform or confine itself to matters within the scope of Board's jurisdiction; or

3. fraud or corruption by a Board member.

Plaintiffs urge Board's order should be set aside based on the first and second of those reasons. They charge Board in effect rewrote or amended the Memorandum by ordering an investigation instead of the remedy required by Memorandum § (k): dismissal of the charges against Miller. Thus Board did not conform itself to matters within its jurisdiction (the interpretation of contracts), and that in turn constituted a violation of the Act. Plaintiffs are plainly right.

Admittedly the scope of judicial review under the Act is among the narrowest known to law (*Union Pacific Railroad v. Sheehan*, 439 U.S. 89, 93–94, 99 S.Ct. 399, 401–02, 58 L.Ed.2d 354 (1978)). As *Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Railway Co.*, 768 F.2d 914, 921 (7th Cir.1985) ("*Santa Fe*") put it:

The question for a court reviewing a railroad arbitration decision is much the same—maybe exactly the same, though differently expressed—as when a court is asked to set aside a labor arbitrator's award in an industry subject to section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, rather than the Railway Labor Act. The question is whether the arbitrator interpreted the collective bargaining agreement as distinct from bringing in his own notions of justice to resolve the dispute.

Still, narrow review is not the equivalent of no review at all. And *Wilson v. Chicago and North Western Transportation Co.*, 728 F.2d 963 (7th Cir.1984) teaches even a narrow review compels the setting aside of Board's order where, as here, Board has completely ignored an unambiguous contract provision containing an agreed-upon remedy, in favor of fashioning Board's own form of relief.

*Wilson* held against North Western and in favor of Union in a dispute identical in principle to the one now before this Court. There two plaintiffs (also carmen) had been suspended February 16, 1980 pending an investigation of alleged theft, but no hearing was conducted until February 29. Board's counterpart [10] held North Western had violated Memorandum § (b):

In the case of an employe [sic] held out of service pending investigation account [sic] serious infractions of rules the investigation shall be held within ten (10) days from the date withheld from service.

Nonetheless the *Wilson* board, like Board in this case, failed to order North Western to dismiss the charges against plaintiffs in accordance with Memorandum § (k). Instead it ordered North Western to compensate plaintiffs for lost wages from the date of suspension to the date of dismissal (728 F.2d at 965–66).

Finding Memorandum § (k) unambiguous and North Western's violation of Memorandum § (b)'s ten-day time limit undisputed, our Court of Appeals said (*id.* at 967) (citations to the Act omitted):

This decision [the Board's] clearly alters the terms of the agreement and exceeds the realm of interpretation and application; in its interpretation of the agreement, the Board may not depart from its clear and unambiguous provisions.

The Board attempted to alter the existing agreement by ignoring the provisions mandating the dismissal of charges when the railroad fails to comply with the specified ... time limits recited therein. The Board clearly exceeded the boundaries of its authority in so acting, and the district

---

10. Although the decisional body in *Wilson* was a Public Law Board, the Court of Appeals applied the same scope of judicial review as is given to Board's awards (*id.* at 966 n. 2).

court properly overturned the awards pursuant to 45 U.S.C. § 153 First (q).

### IV. The Railway Labor Act.

The Railway Labor Act requires that agreements negotiated under its auspices may only be amended by the parties through the collective bargaining process.... The authority of arbitration boards established under the Act is limited exclusively to the interpretation or application of existing agreements.... The agreement between the Union and the Chicago and North Western requires the dismissal of disciplinary charges if the railroad fails to hold required investigative hearings within the specified time limits; under the Act this provision can only be altered through the collective bargaining process. We hold that [the Board] exceeded its authority in attempting to alter this provision and fashion their own remedy. This attempt to rewrite the agreement is a clear violation of the Railway Labor Act, and is a proper basis for the district court to set aside the awards.

### V. Conclusion

The language of the agreement between the railroad and the Union is clear and unambiguous. Two of the three possible reasons for which a district court may overturn the award of an arbitration board under 45 U.S.C. § 153 First (q) have been clearly demonstrated in this case: (1) the board has failed to comply with the requirements of the Railway Labor Act; and (2) the board has failed to confine itself to matter within its jurisdiction. We hold that the defendant's contention that the district court exceeded its scope of review is without merit. The decision of the district court is hereby AFFIRMED.

That language could have been written specifically for this case. Here too Board ignored the Memorandum § (k) mandate for dismissal when no timely investigation had been held. Here too, then, Board impermissibly "attempt[ed] to rewrite the agreement" in clear violation of the Act.

North Western tries to wriggle out of Wilson's inexorable grasp. Its Mem. 8–9 notes Miller was acquired from the Rock Island through the Miami Accord. Hence it claims this case is like Santa Fe rather than Wilson because Board faced a "tangled web of collective bargaining agreements" and had to consider the "interplay of particular provisions of those agreements" in resolving the dispute.[11]

But Santa Fe has no such relevance to this case. There the court upheld Board's conclusion a particular contract provision had been superseded by tacit agreement of the parties (because the purpose and reason for the contract provision no longer existed), observing (768 F.2d at 923):

> A determination that a contract has been modified by another contract, or by voluntary joint action of the parties, is itself contractual interpretation, and is within the jurisdiction of the arbitrators under the compulsory-arbitration scheme established by the Railway Labor Act.

Unlike the Santa Fe Board, however, in this case Board found no "tangled web" had enmeshed its analysis. It specifically concluded Memorandum § (a) applied to Miller and entitled him to an investigation, rejecting any notion the Memorandum had been modified by joint agreement of the parties in light of the Miami Accord.

Indeed, the Miami Accord is a total red herring. It was not at all a factor in Board's decision. Board was called on to determine whether Miller's transfer from one North Western department to another (resulting in his being "in service" within the new department for fewer than 60

---

11. North Western R.Mem. 12 also suggests Wilson is somehow different from this case because North Western and Union did not expressly agree here, as they did in Wilson, that Board could only interpret and apply the parties' agreement and not change it or enact new rules.

Yet North Western is well aware (see its Mem. 7 and 10) Board, even absent such an express agreement, is limited to interpreting agreements between the parties. It cannot make new ones for them, and that is precisely Wilson's thrust.

days) eliminated his right to an investigation under Memorandum § (a). To resolve that issue, Board examined whether the parties intended "in service" to be the equivalent of "seniority" (Award at 4)—and it did not even advert to the Miami Accord on that score.[12] That is entirely understandable, for how Miller came to be employed by North Western is wholly irrelevant to the effect to be given his later *transfer* from one North Western department to another. That question (departmental v. railroad-wide tenure) would have been answered no differently had North Western *hired* Miller as a sheet metal worker in 1980 (rather than acquiring him through the Miami Accord), and had he later transferred from sheet metal worker to carman.

In sum, there is no gainsaying *Wilson* is directly on point. Board exceeded the scope of its authority in violation of the Act, just as its counterpart did in *Wilson,* by flouting an unambiguous mandate in the Memorandum (dismissal of the charges) in favor of its own notions of an equitable remedy. That order must be set aside.

■ Only one question remains: the scope of relief to which Miller and Union are entitled. By definition Board's Award viewed Miller as having been "disciplined or dismissed," else Memorandum § (a) would never have come into play for the proposed "fair and impartial investigation." And by definition the Memorandum § (k) mandate, calling for dismissal of charges where there has been no timely investigation, means the underlying action (here the termination of Miller's assignment as carman) was "unjust" as a matter of law—irrespective of what a timely investigation might have disclosed on the merits. Because Miller was thus "unjustly disciplined or dismissed" in legal terms, Memorandum § (h) defines the relief to which he is entitled.

---

**12.** North Western R.Mem. 6 points to Board's one mention of the Miami Accord (Award at 3) as evidence the Board "clearly considered the Rule 35 claim in light of the Miami Accord...." Not so. All Board did was to use Miller's initial

*Conclusion*

There are no genuine issues of material fact, and Miller and Union are entitled to a judgment as a matter of law. Board's order is set aside, and the case is remanded with directions to consider North Western's October 22, 1982 action as wholly without effect (no timely investigation having been held), and to provide Miller the relief specified in Memorandum § (h).

date of hire "under the Miami Accord" as a reference point: the date upon which he began to be "in service" for purposes of Memorandum § (a).