Sandra POKUTA, Plaintiff–Appellant,

v.

TRANS WORLD AIRLINES, INCOR-PORATED, Defendant–Appellee.

No. 98–3697.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1999.

Decided Sept. 17, 1999.

Arthur R. Ehrlich (argued), Chicago, IL, for Plaintiff–Appellant.

Thomas J. Piskorski, Deborah A. Kop (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant–Appellee.

Before BAUER, FLAUM, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Trans World Airlines ("TWA") discharged Sandra Pokuta from its employ after she engaged in an altercation with other TWA employees. A three-member board of arbitration later concluded by a two-to-one vote that the company had just cause to terminate her. Pokuta then filed suit under the Railway Labor Act, 45 U.S.C. § 153 First (q), seeking to have the decision of the arbitrators overturned. The district court dismissed her complaint, concluding that Pokuta's allegations stated

no claim on which relief could be granted. *Pokuta v. Trans World Airlines, Inc.*, 159 L.R.R.M. (BNA) 2499, 1998 WL 704170 (N.D.Ill. Sep. 29, 1998); *see* FED.R.CIV.P. 12(b)(6). Pokuta has appealed, contending that the allegations of her complaint, accepted as true, set out due process violations grave enough to warrant federal-court intervention. We disagree and therefore affirm the dismissal of this suit.

**I.**

We have drawn the following facts from the complaint as well as the written opinion of the board of arbitrators. TWA attached the board's opinion to its motion to dismiss, and because the board's decision is central to Pokuta's claim, we, like the district court, may consider it in evaluating the viability of her claims. *See Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1459, 143 L.Ed.2d 544 (1999), quoting *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir.1994).

Pokuta worked for TWA for thirty-three years. At the time of her discharge, Pokuta was based at Chicago's O'Hare International Airport, where she had recently been promoted to the position of the Employee–in–Charge or Lead Agent. Pokuta was also a member of the employee bargaining unit represented by the International Association of Machinists and Aerospace Workers (the "Union" or "IAMAW").

The events that led TWA to fire Pokuta took place on the evening of March 30, 1996. A Sun Country charter flight from Acapulco arrived an hour late at O'Hare's international terminal. The flight was returning some seventy people to the United States from a Royal Caribbean ocean cruise. Upon their arrival in Chicago, all of the passengers on the Sun Country flight were to transfer to TWA's Flight 669 to St. Louis—the last scheduled flight of the day to St. Louis from O'Hare. But the late arrival of the flight from Acapulco left

passengers with little more than an hour to claim their luggage at the international terminal, clear Immigration, re-check their bags at the TWA counter in another terminal, walk to the gate, and board the connecting flight.

As TWA's Employee–in–Charge that evening, Pokuta herself could delay the departure of Flight 669, but for no more than ten minutes. Only the company's Operations Planning division had the authority to postpone the departure further, and it declined. Once she was so apprised, Pokuta instructed Elizabeth Hernandez and Charity Di Liberti, the Customer Service Agents stationed at the TWA ticket counter, not to send any more of the late passengers to the gate but instead to book them on another flight the following day. Rather than assisting Hernandez and Di Liberti at the ticket counter, Pokuta decided to help Customer Service Agent Bruce Alcorn prepare the St. Louis flight for departure. Roughly half of the passengers from the Sun Country flight were able to make the connection, aided in part by the flight captain's decision to order the plane's fuel tanks topped off. When the flight left for St. Louis some fifteen minutes behind schedule, between thirty and forty passengers were left behind.

After the flight departed, Pokuta returned to the TWA ticket counter at the front of the terminal, where the stranded passengers were gathered. By all accounts, it was an irate crowd. The passengers had apparently been led to believe when they first arrived at O'Hare that the connecting flight to St. Louis would be held for them. It seems they were also told that TWA would pick up their baggage at the international terminal and escort the passengers to the gate. None of that turned out to be true, and when passengers learned they would have to spend the night in Chicago, they vented their frustration upon the airline personnel at hand. Rob Mandik, the Chicago Passenger Service Manager for Sun Country Airlines, testified that this was one of the

most upset groups of passengers he had dealt with in his twenty-year career. Pokuta herself said the same. And Skip Sweeney, the Vice President of Operations for Flight Time International, which had arranged the Sun Country charter for Royal Caribbean, testified that this was "one of the most intimidating events [he had ever experienced] at the airport." R. 6 Ex. A at 19. The passengers were so close to him and the other agents, Sweeney recounted, that they were "smelling our breath." Id.

The altercation that culminated in Pokuta's discharge stemmed from TWA's decision not to issue the stranded passengers vouchers that they could use to obtain lodging at the airline's expense. Because TWA deemed the late arrival of the Sun Country flight to be the cause of the passengers' plight, it disclaimed responsibility for providing them with overnight accommodations. Pokuta had spoken with TWA Station Manager Jim Cyr when she had learned that the passengers would be stranded, and Cyr had authorized her to issue letters of apology along with $50 coupons that the passengers could use on their next TWA flight. When Pokuta arrived at the ticket counter following the departure of the St. Louis flight, she conferred with Sweeny and Mandik in an effort to resolve the question of accommodations. They agreed that Royal Caribbean, not TWA, would bear the responsibility of compensating passengers for overnight lodging, and Mandik was able to arrange for rooms at the O'Hare Hilton Hotel.

Even as these arrangements were being made, however, Hernandez and Di Liberti were preparing to issue hotel vouchers to the passengers. Apparently, while Pokuta had been at the gate prior to the departure of Flight 669, Hernandez had attempted without success to call or page her for instructions as to what she and Di Liberti should do for the passengers who were unable to make the flight. Hernandez testified that when she was unable to reach Pokuta, she had telephoned Cyr, the sta-

tion manager, at home for instructions. Cyr recommended that TWA help the passengers find overnight accommodations. Hernandez apparently misunderstood Cyr to be suggesting that TWA issue hotel vouchers to the passengers, which would of course leave TWA to foot the bill.

When Pokuta discovered that Hernandez and Di Liberti were in the process of issuing vouchers to the passengers, tempers flared and decorum vanished. The testimony is conflicting as to precisely what occurred. The details of the conflicting accounts are not important. Suffice it to say that according to Hernandez and Di Liberti, when Pokuta saw Hernandez approaching the ticket counter with a handful of hotel vouchers, she accosted Hernandez, grabbed and twisted her wrist, and pushed her up against a wall, all in an effort to take the vouchers from her. All of this purportedly took place in front of passengers, who attempted to intervene on Hernandez's behalf. Pokuta purportedly remarked to them, "That's ok. She no longer works for TWA."

Pokuta told a very different story. She testified that she had instructed Hernandez and Di Liberti more than once *not* to issue hotel vouchers, but that the two agents refused to obey her. At one point, when Pokuta approached the ticket counter and noticed that Hernandez and Di Liberti were filling out hotel vouchers, Di Liberti turned and screamed at Pokuta that she was not their supervisor and could not take the vouchers away from them. Later, after hotel rooms had been arranged for the passengers and Pokuta was sitting in an office filling out the travel coupons, Hernandez came into the office, grabbed Pokuta by the hair, and began pummeling Pokuta with her fist. Alcorn stepped into the office a moment later when he heard Pokuta yelling. Pokuta told him that Hernandez had attacked her, but Alcorn had not actually seen what had transpired.

The airline suspended Pokuta pending an investigation of the incident. The company subsequently held a discharge hearing before John Cherne, the TWA station manager at Kansas City. The Union represented Pokuta at this hearing. After reviewing the evidence, Cherne concluded that Pokuta had violated two of TWA's General Rules of Conduct: Number 4, which prohibits "[v]iolence, fighting, horseplay, threatening or interfering with other employees at any time on Company premises," and Number 16, which provides that "[a]ll duties shall be performed in a professional and business like manner...." Cherne stated:

> After thoroughly reviewing all of the evidence presented at the hearing, it is my opinion [that] your failure to provide instructions and guidance to ... Hernandez and Di Liberti regarding the handling of a group of late arriving passengers led to a routine misconnect situation getting out of control. These employees attempted to provide service by issuing hotel vouchers after you failed to respond to numerous telephone calls and paging messages trying to locate you for instructions. When you finally arrived at the ticket counter you disagreed with what you observed and physically attempted to remove hotel vouchers from Hernandez's possession by twisting her arm and pinning her against a wall. A second altercation occurred between yourself and Hernandez. While engaged in these confrontations you screamed at Hernandez, telling her she was fired. You also tried taking a telephone away from Di Liberti while she was talking to the station manager. During the hearing you denied any such actions on your part, even though Station Manager Jim Cyr read statements taken from customers and presented letters stating your actions were observed.
>
> \* \* \* \* \* \*
>
> I personally called a couple of the passengers; both stated they thought the incident unfortunate and should not have occurred. Mrs. Margaret Hansen stated Ms. Pokuta was frustrated and

was not civil. Based on these statements and other testimony it is my opinion that you violated the trust and authority given your position as EIC and that you did physically and verbally interfere with the other employees' performance of their duties.

These are serious offenses and cannot be condoned in the performance of your duties as EIC and representative of this company.

Therefore, I must conclude that the charges brought against you by the company are justified. Considering the gravity of the offense, your seniority and work record, it is my decision that you are hereby discharged from employment with TWA effective April 24, 1996.

R. 6 Ex. A at 3–4 (quoting Cherne's decision). The Union protested the Company's decision to fire Pokuta, but the grievance was denied at each step of the contractual grievance procedure.

Pokuta exercised her right under the collective bargaining agreement to appeal her discharge to the TWA/IAMAW System Board of Adjustment (the "Board" or "SBA"). That Board consisted of three members: one chosen by TWA, one by the Union, and a neutral referee appointed by the parties who served as chairperson. The SBA held a two-day hearing late in 1996. Pokuta was represented at the hearing by counsel that she retained. TWA presented three witnesses at the hearing: Hernandez, Di Liberti, and Alcorn. Pokuta testified, and in addition she presented Mandik and Sweeney as witnesses. Also introduced into evidence were letters from two of the passengers who missed the flight to St. Louis and had occasion to observe Pokuta.

The SBA ruled in the company's favor, with the Union representative dissenting. After summarizing the evidence at length, the Board concluded that TWA had just cause to fire Pokuta. The Board made a number of points:

1. Early in the evening, Pokuta was aware that the Sun Country flight would arrive late, that TWA would not hold the flight to St. Louis, and that as a result the passengers would not make the connection. Pokuta had also spoken with Hernandez and Di Liberti, whom Pokuta described as "extremely upset" at the prospect of having to deal with the stranded passengers. Despite that knowledge, Pokuta had opted to assist at the gate rather than with Hernandez and Di Liberti at the ticket counter.

2. As the passengers began to arrive at the ticket counter and tensions escalated, Pokuta could not be reached by telephone or by page. (Although Pokuta was in the gate area, she was nonetheless inaccessible while she was on the jetway assisting with passenger boarding, for example.) As the EIC, Pokuta understood what TWA's responsibilities were under these circumstances and knew the appropriate steps to take, whereas the more junior agents apparently did not. Hernandez and Di Liberti were thus left to fend for themselves.

3. When, after speaking with Station Manager Cyr, Hernandez and Di Liberti mistakenly began to issue hotel vouchers, Pokuta overreacted.

The Grievant became so obsessed with issuing discount coupons instead of hotel vouchers that we must credit the testimony of Hernandez and Di Liberti that she "snapped." Both Hernandez and Di Liberti appeared and sounded credible at the arbitration hearing. Their versions of events were internally consistent and consistent with each other and with the letters from the two passengers. That the Grievant attempted to "fire" Hernandez is supported by Di Liberti, the passengers and even the Grievant's own statement.

R. 6 Ex. A at 31.

4. The Board acknowledged that Hernandez and Di Liberti may have been partially responsible for the problem, and yet neither of them had been discharged. Nonetheless:

[T]heir conduct does not necessarily rise to the level of requiring discipline to validate the Grievant's discharge. For one thing, Hernandez and Di Liberti were agents while the Grievant was the EIC and responsible for maintaining order and calm at the counter. She was in a position of some authority and it was a gross abuse of her position to physically and verbally assault these two agents. She assaulted them in front of passengers, which only made the situation worse. And, it is axiomatic that if an employee (especially a lead employee) assaults another employee that is grounds for potential termination....

R. 6 Ex. A at 35–36.

## II.

■ We review the district court's decision to dismiss the case for failure to state a claim de novo. *E.g., Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 526 (7th Cir.1999). The standard inquiry is whether relief is possible under any set of facts consistent with the allegations of the plaintiff's complaint. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). But this suit arises under the Railway Labor Act, 45 U.S.C. § 153 First (q), which establishes a framework for the efficient resolution of labor disputes within the transportation sector. *See generally Kulavic v. Chicago & Ill. Midland Ry. Co.*, 1 F.3d 507, 512–13 (7th Cir.1993). In keeping with the purpose of that framework, and with the statute itself, which permits federal courts to intervene only in limited circumstances, judicial review of a board of arbitrators' decision is "among the narrowest known to law." *Union Pa-*

*cific R.R. Co. v. Sheehan*, 439 U.S. 89, 91, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978) (per curiam) (internal quotation marks and citation omitted); *see also, e.g., Lyons v. Norfolk & Western Ry. Co.*, 163 F.3d 466, 469 (7th Cir.1999). Whether the complaint articulates a viable claim for relief consequently depends on whether Pokuta's allegations state the types of objections that would permit us to upset the decision of the Board.

Generally speaking, a federal court has jurisdiction to review the Board's decision only when it is asserted that (1) the Board failed to comply with the requirements of the Railway Labor Act; (2) the Board failed to confine itself to matters within its own jurisdiction; or (3) the Board or one of its members engaged in fraud or corruption. § 153 First (q); *e.g., Lyons*, 163 F.3d at 469. The objections that Pokuta presently makes to the SBA's decision fall within none of these categories. However, we have recognized a fourth category of objections that supply jurisdiction over the award—an allegation that a party was denied due process. *E.g., Bates v. Baltimore & Ohio R.R. Co.*, 9 F.3d 29, 31 (7th Cir. 1993); *Morin v. Consolidated Rail Corp.*, 810 F.2d 720, 722 (7th Cir.1987) (per curiam). Pokuta has framed her objections to fit within this category. For the reasons that follow, however, we agree with the district court that Pokuta's allegations do not state viable claims for the deprivation of procedural due process.

Pokuta first complains about a copy of a letter that TWA's counsel sent to the company's representative on the SBA while the Board had her appeal under consideration. That letter was addressed to Pokuta's attorney, and asserted that Pokuta had been making harassing telephone calls and office visits to Hernandez, Di Liberti, and another witness. R. 6 Ex. C. Pokuta asserts that the SBA's receipt of that letter, with its unflattering assertions as to Pokuta's conduct, tainted the Board's consideration of her appeal.

■ We need not reach the merits of this argument. We do note that the SBA made no mention of the letter in its decision; indeed, there is no allegation that the airline's representative on the Board even shared the letter with the other members. The dispositive point, however, is that Pokuta has waived her contention that it was improper for TWA's attorney to have copied the company's SBA representative on the letter. The letter was addressed to Pokuta's attorney, of course, and the letter itself indicated that a copy was sent to the airline's representative on the Board. Pokuta and her counsel were thus on notice that at least one member of the SBA had a copy of the letter. Nearly a month passed before the SBA issued its decision (more than ample time to take action), and yet Pokuta's counsel did nothing. We agree with Judge Gottschall that Pokuta had an obligation to raise the issue with the Board in a timely manner if she believed that transmittal of the letter to the SBA was improper. 1998 WL 704170, at *4, citing, inter alia, *Health Servs. Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1263–64 (7th Cir. 1992); *see generally National Wrecking Co. v. International Brotherhood of Teamsters, Local 731*, 990 F.2d 957, 960–61 (7th Cir.1993); *United Food & Commercial Workers Local 100A v. John Hofmeister & Son, Inc.*, 950 F.2d 1340, 1343–45 (7th Cir.1991); *Chicago Newspaper Guild v. Field Enters., Inc.*, 747 F.2d 1153, 1157–58 (7th Cir.1984). Pokuta complains that by the time the letter was sent, the record was closed and the post-hearing briefs had been submitted. But she identifies no impediment to a motion or other vehicle through which the Board could have been alerted to her objection. Having omitted any attempt to pursue her objection before the SBA, Pokuta has forfeited the opportunity to do so here.

The failure to act promptly with respect to the letter leads us to Pokuta's second objection: that her counsel before the Board labored under a conflict of interest. It turns out that the attorney Pokuta engaged to prosecute her appeal to the SBA was a member of TWA's board of directors; and Pokuta claims not to have known this fact until after she lost the appeal. Not surprisingly, she now contends that an attorney burdened with such an obvious conflict of interest could not represent her effectively.[1]

■ As troubling as the asserted conflict may be, Pokuta has not established a due process violation. As she did below, Pokuta makes this argument without citation to any case establishing that a privately-retained attorney's conflict can give rise to a due process violation in an arbitration proceeding. *See* 1998 WL 704170, at *4. As TWA points out, the well-settled general rule is that there is no constitutional or statutory right to the effective assistance of counsel in civil cases. *Hutcherson v. Smith*, 908 F.2d 243, 245 (7th Cir.1990); *Lewis v. Lane*, 816 F.2d 1165, 1169 n. 6 (7th Cir.1987); *Wolfolk v. Rivera*, 729 F.2d 1114, 1119–20 (7th Cir.1984), quoting *Watson v. Moss*, 619 F.2d 775, 776 (8th Cir. 1980); *see generally Lassiter v. Department of Social Servs. of Durham County, N.C.*, 452 U.S. 18, 26, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981) ("as a litigant's interest in personal liberty diminishes, so does his right to appointed counsel"). We are given no reason to believe that a different rule applies in the arbitration context. The remedy, if any, lies not in a due process claim, but an action for malpractice. *E.g., Deppe v. Tripp*, 863 F.2d 1356, 1360, 1365 (7th Cir.1988).

■ Finally, Pokuta contends that the Board gave "undue emphasis" to hearsay in the form of letters from two of the passengers who witnessed the events at issue in this suit. The Board's opinion reveals that it only gave the letters "some weight," however. R. 6 Ex. A at 15. Po-

---

1. Other attorneys at the director's law firm actually represented Pokuta at the hearing before the SBA, but Pokuta contends that she was nevertheless instructed to deal exclusively with the conflicted attorney.

kuta cites nothing about the passenger letters that rendered them inherently unreliable as evidence, an omission that reveals her claim to be more of an argument that the Board weighed the evidence improperly, an argument that exceeds the narrow scope of our review. *See, e.g., Steffens v. Brotherhood of Ry., Airline & Steamship Clerks*, 797 F.2d 442, 447 (7th Cir.1986); *Anderson v. National R.R. Passenger Corp.*, 754 F.2d 202, 203–04 (7th Cir.1984); *cf. Bates v. Baltimore & Ohio R.R. Co., supra*, 9 F.3d at 32 (claim concerning the authenticity of a transcript considered, but not given conclusive weight, by National Railroad Adjustment Board amounts to "an evidentiary dispute which does not fall within any of the narrow jurisdictional grounds for review under 45 U.S.C. § 153 First (q)"). Moreover, as TWA points out, the letters were first introduced into evidence at the discharge hearing. Consequently, it is apparent that Pokuta was not deprived of the opportunity to respond to this evidence. Under these circumstances, we can discern no basis for a due process claim.[2]

### III.

 TWA has requested that Pokuta be ordered to pay its costs, including attorney's fees, as a sanction for the frivolous nature of this appeal. *See* FED. R.APP. P. 38. In weighing that request, we consider first whether the appeal is indeed frivolous, and, if so, whether sanctions are appropriate. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 331 (7th Cir.1995), *cert. denied sub nom. Carlson v. ICI Americas Inc.*, 517 U.S. 1136, 116 S.Ct. 1423, 134 L.Ed.2d 547 (1996). Ultimately, the decision whether or not to impose sanctions is a discretionary one. *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 938 (7th Cir.1989) (en banc). Whether the appeal was pursued in bad faith is a factor that we often consider in the exercise of that discretion. *Lorentzen*, 64 F.3d at 331.

 Although, given the narrow scope of our review, this appeal does border on the frivolous, we do not believe that sanctions are appropriate. As the district judge noted, Pokuta was discharged "based on highly conflicting evidence, growing out of a fast-moving and confusing incident." 1998 WL 704170, at *4. Her lengthy record of service with the company prior to that incident was apparently unblemished; indeed, she had just been promoted. *Id.* The grounds she has asserted for review are legally tenuous, but the troubling nature of her conflict-of-interest claim renders them somewhat more colorable than they otherwise might have been. We see no evidence of bad faith. Therefore, in the exercise of our discretion, we deny the request for fees and costs.

### IV.

The allegations of the complaint reveal no basis on which the decision of the System Board of Adjustment could be disturbed. We therefore AFFIRM the dismissal of Pokuta's complaint. The request for sanctions is DENIED.

---

2. In passing, Pokuta suggests that it was "irrational" for the Board to conclude that Pokuta "snapped" as the result of her "obsession" for issuing flight coupons rather than hotel vouchers. Pokuta Br. 16–17; *see* R. 6 · Ex. A. at 31. As an invitation to re-weigh the evidence before the Board, this argument is, of course, unavailing. *E.g., Steffens*, 797 F.2d at 447.